NEW YORK COUNTY.—HON. D. C. CALVIN, SURROGATE.—FEBRUARY, 1877.

## MARSH *v.* GILBERT.

### *In the matter of the Estate of* JAMES MARSH, *deceased.*

An executor who, at the time of the making of the will, resided within the jurisdiction, and removes therefrom after undertaking the duties of the office, is not entitled to charge, in his accounts, his traveling expenses in visiting the place of jurisdiction on the business of the estate.

*It seems* that an advancement made in stocks, and charged on the testator's books at an estimated value, may be regarded as no advancement, if the stocks be proved to have been valueless at the time the charge was made.

But to avoid the effect of an advancement, on such a ground, the evidence should be clear.

Section 399 of the Code of Procedure, excluding the testimony of a party, &c., to a personal transaction or communication between him and a person deceased, in certain cases, does not preclude a party from testifying that he overheard a conversation with the deceased, in which the witness did not participate.[*]

An objection to the exclusion of a question on the examination of an executor or administrator, on his accounting, should not be sustained, if the materiality of the question does not appear, by connection with the point in issue.

THIS was a proceeding for the final settlement of accounts of the executor of the will, &c., of James Marsh, deceased.

The executors, Clinton Gilbert and James Marsh, Jr., filed an account of their proceedings, July 7th, 1874. Objections being filed, the account, with such objections, was referred to an auditor who filed his report December 27th, 1876, to which exceptions were filed January 8, 1877, by James Marsh, Jr., one of the executors.

During the pendency of the reference, Marsh, one of the executors, filed a supplemental account. The au-

[*] On this subject, see *Brague* v. *Lord,* 2 *Abb. New Cas.,* 1.

ditor among other things disallowed a charge made by said executor in his supplemental account, for expenses to and from Philadelphia, and also disallowed a claim made by him for $12,500, with interest from the death of the testator, $3,864.58, amounting in all to $16,364.58.

To this finding Marsh filed exceptions, stating various forms of objection to the conclusions of fact in reference to the disallowance last above stated, and also to the general result reached, by which the auditor had found that there remained in the hands of Marsh, $1,312.68, subject to the payment of the balance of the executor's commissions, &c. The charge for expenses appeared to have been made by the executor, James Marsh, Jr., for traveling expenses &c., in coming from Philadelphia where he resided, to the city of New York, for the purpose of filing, and settling his account as executor.

The testimony showed that when he was appointed, and claimed to undertake the duties of his office, he resided in the city of New York, but subsequently thereto removed to Philadelphia, where he continued to reside, and engaged in business.

The testimony taken before the auditor which was very voluminous, principally related to the disallowance of the $12,500, with interest.

It appeared that the testator made his last will and testament dated November 27th, 1869, and died the 25th day of October, 1872, leaving three children, Walter R. Marsh, Mrs. Josephine M. Brown, and James Marsh, Jr., the executor, legatees.

His will among other things, provided in the fourth clause, that after the decease of the testator's wife, his children should share his property equally, but until the final distribution, no one of them should receive

incre than $10,000; and it stated in the fifth clause, that the payments that had been made to his children, out of his estate, were, to Walter $10,000, in cash and to Josephine $5,000 in bonds, and that Josephine was to receive her board, and lodging free of charge while she remained unmarried as an equivalent for the large sum paid Walter, but should she marry, or leave him then she was to have the further sum of $5,000. The sixth clause provided that James should receive the interest on $5,000, and board and lodging, free of charge, and when he wished, he should receive $10,000 in cash, at which time the interest on $5,000 and the free board and lodging should cease.

It appeared on the books of the testator that he kept accounts with his children, which were adjusted January 1, 1871, when he charged to Walter R. $12,500, Mrs. Josephine M. Brown $10,000, and to James Marsh, Jr., $12,500.

As to this latter charge the controversy arose; he, James, claiming that he never received the amount; that it was charged to him for stock of the American Fertilizing Company, (par value $20,000) at 62½ cents, which as was claimed by him turned out to have been worthless, when It was delivered to him, and therefore he claimed, that he was entitled to his proportion of the estate, without regard to such charge and that he was not chargeable with that sum, as an advancement.

On the hearing, the executor Marsh testified that he came into possession of some of the books of the testator soon after his decease, that the said company became bankrupt six months before his father's death, that he was treasurer of that company but held his other office in it—that he held the receipt of Walter R. Marsh for his $12,500 given to deceased before his death; also

receipts by Josephine M. Brown for $10,000; that in his first account filed July 7, 1874, there was no claim inserted by him against the estate; that he never filed any claim against the estate, that he resigned as treasurer of the company in August, 1872; that there was no formal dissolution of the company ; the officers resigned, and the directors ceased to meet ;—that the company had a factory, machinery, and patents; that the principal factory was sold to the American Chemical Works Company, and he purchased the little factory, and its tools and patents were sold to the last named company —that his father gave him $20,000 of the stock of the Fertilizing Company in January, 1871.

The charge in testator's books was "January 6th, 1871, James Marsh, Jr. debtor. Cash paid him on account his interest in my estate, $12,500." The witness further testified that his father gave him the stock in question on the 7th January, 1871 ; that he paid his father board from August, 1870, but stopped paying board from the middle of the year, 1872, because the Fertilizing Company had stopped, and failed; that he received no money from his father whatever, and that the entry in the book was an error ; that testator's journal under date January 1871, charged witness with 800 shares at 62½ cents, $12,500.

Clinton Gilbert, one of the executors, testified that he was present at the opening of testator's will, in the presence of Mr. Marsh, the other executor; Mrs Marsh the mother, Mrs. Brown and Mr. Brown read the will ;—remarks were made by different persons present, as to what each had had, and it resulted in the acknowledgment on the part of young Mr. Marsh, that he had received $10,000 and $2,500, and his sister was to receive $5,000 Dissatisfaction was expressed at the amount Marsh, the executor, had received, and he then proposed to pay

each $2,500. He further testified that he never heard of Mr. Marsh's $12,500 claim, until he heard it in the Surrogate's office at the time of the accounting; his recollection being that Mr. Marsh said that his brother Walter, who was then deceased, had received $10,000, that he, James Marsh, had received $10,000 at one time, $2,500 at another time, that he had had that amount from his father; that there was nothing said on that occasion about the Chicago property; that that executor, James Marsh, did not say to him soon after the reading of the will, that he could not get a good title to the Chicago land because of the child; that he did not think he had had any advancement; that he expected to have been made good by the purchase of the Chicago property.

Edward J. Brown, the husband of one of the legatees, called for contestants, testified that in a conversation with Mr. Marsh, he told him that in 1870, the Fertilizing Company was a good thing, and that he was going into it, going to put in $10,000; had heard him say that he owned $20,000 of the stock; that he acquired it January 6th, 1871. Walter Marsh died June 24th, 1872. Witness was present at the testator's house, soon after the funeral, when the will was read. James Marsh on that occasion said that Walter had had $10,000, $2,500 more than Mrs. Brown; that he had had $10,000, and $2,500 out of his share of the estate; and as the will called for but $10,000 for him, he would pay back $2,500 at once, and asked Mrs. Walter Marsh to do the same thing; and she said it would be inconvenient to do so. Witness then suggested that his wife should be paid $2,500, which would equalize all three, and nothing would be necessary to be paid back. He made no claim at that time, that he was entitled to an allowance because of his connection with the American Fertilizing Company.

Mary S. Marsh, the widow of Walter R. Marsh, a witness called for the contestants, testified: that she was present at the reading of the will in question, when James Marsh said that he and Walter had both received $12,500 from their father; that he had the receipts in an envelope in his hands, which contained what he had received, and said he was willing to pay back $2,500 to the estate; that W. Brown suggested that his wife should receive $2,500 instead, making it even—that she had no remembrance of James Marsh speaking of the Chicago property at that time.

Josephine M. Brown, a witness called for the contestants, testified: that she was present at the reading of the will; remembered a conversation about $2,500 which she had not received; that the executor Marsh proposed paying back $2,500; that Mrs. Walter Marsh should pay back the same; that her husband proposed that she should receive $2,500 more, which Mr. Marsh objected to; that he preferred to pay back his $2,500.

George P. Avery, Esq., counsel for the executor Marsh, was called, and testified that: he was present at the house of the testator soon after his death, when the conversation took place in respect to the advancement made by the deceased. James Marsh then said that he would give Josephine $2,500, if Mrs. Walter Marsh would give her the same amount. Mrs. Marsh said she could not do so, that she didn't see why she should give her $2,500, or how she was going to do it. James then said they had $1,600 of her money in hand, and would let her have the rest. Witness told James on that occasion that he could not get a good title to the Chicago property. Witness went to see Mr. Gilbert, with Mr. Marsh, a short time before the accounting, and had a conversation. James's stock

was valueless, but the matter was charged in the book; he thought that the whole subject should come before the Surrogate—that he was clearly entitled to something more than the others.

James Marsh was recalled on his own behalf, and testified that on the occasion of reading the will he did not make any offer to pay any money. He said his brother had received $12,500 cash; his sister $5,000 in mortgage, and he had received some Fertilizing Company stock, which was not good; and that his father had sold him his interest in the Chicago property for about half what it was worth;—that he expected to have got it, when Mr. Avery told him he could not get a title;—that then he offered if he could get the property, to equalize the three payments by paying back enough into the estate, if his sister-in-law would do the same, and suggested that she had $1,600 in his father's estate, the proceeds of her husband's life policy; that the will provided that each should have $10,000, that his brother had received $2,500 more, and when Mr. Avery told him he could not get title to the Chicago property, he said he would think about it, and consult with Mr. Gilbert. That if he got the Chicago property he was to pay back $2,500, because he knew he had got a deal of money by that purchase, but that it was a voluntary proposition on his part. Edward J. Brown, recalled for contestants, testified that at the interview spoken of, Mr. Marsh did not say that he had received the Fertilizing Company's stock, that it was not good, that his father had sold him his interest in the Chicago property, for about half its worth, nor did he offer to equalize the payments of the children, if he got the property by paying back. Mary S. Marsh, recalled for contestants, testified, that she did not remember anything of that kind, or any condition of

his getting the Chicago property, for the offer made by him to refund.

Josephine M. Brown, recalled for the contestants, corroborated Mrs. Marsh, in respect to the same alleged conversation.

Edward J. Brown, recalled, testified that James Marsh, Jun., told him, before the death of his father, that he had bought the Chicago property, and that he could not get a title.

Edward J. Underhill was called on behalf of the contestants to prove the testimony given by James Marsh Jun., on a former accounting, which in several material, respects tended to contradict his testimony on this examination.

Samuel A. Mitchell, called on behalf of the contestants, testified in respect to the Fertilizing Company, that it owned property of esteemed value and that he supposed it to be in a prosperous condition long after Mr. Marsh's connection with the company.

In the course of the examination the following questions were propounded to Mr. Marsh, by his counsel.

Q. In the trips with your father to Chicago, were you present at Mr. Meade's office during a conversation between your father and Mr. Meade, in which you did not participate, relating to the subject of the transfer of this property to you, by way of advancement? Did your father know you were present at the time of the conversation?

This was objected to, as incompetent, under section 399 of the Code. The objection was sustained, and the executor's counsel excepted.

GEORGE P. AVERY, *for the executor.*
GEORGE E. HOWE, *in opposition.*

THE SURROGATE.—[After stating the facts and the substance of the testimony as above],—I am clearly of

the opinion that there is evidence sufficient to sustain the findings of fact of the auditor, and such as forbids my interfering with his conclusions, especially as the auditor had the witnesses before him, and could best judge of their credibility. I must therefore assume, for the purpose of disposing of the question of confirmation of the report, that the facts are correctly found by the auditor, and hence the only questions to be considered are those of law, growing out of and dependent upon the questions of fact thus found.

As to the disallowance of the executor's expenses in coming from Philadelphia to attend the accounting, I am of the opinion that the auditor was correct in his conclusions. The executor, when appointed, resided in the city of New York, and it may be presumed that the testator took into account that fact, as enabling the executor to give the necessary attention to the estate, without any extraordinary expenses.

It is urged by counsel for the executor that the appointment did not involve the necessity of the executor's continuing to reside in the same place, without regard to the exigencies of his business, and personal interests, which is doubtless true; and when he removed from the jurisdiction of the court, he was at liberty to do so, but not at the expense of the estate; and if the principle contended for by the executor be sustained, then the removal of an executor to California, or Europe, might involve, to an ordinary estate, ruinous expenses in returning to settle up the estate, and when carried to such an extent, the absurdity of the pretended principle, is made entirely apparent.

The question as to the advance charged by the testator, of $12,500, against the executor, James Marsh, Jun., is one of more embarrassment because of the contradictory character of the testimony.

If the testimony warranted the conclusion that the stock of the Fertilizing Company, at the time when it was delivered to said executor by the testator, and charged to him, was valueless, I should not hesitate to say, that the charge by way of advancement was without consideration, and void ; but the testimony offered by the executor is not satisfactory upon the subject of the alleged worthlessness of the stock in question. It does not appear that on discovering that it was worthless, he offered to return it to the testator, or made any claim against him in respect to it, but on the contrary, he seems to have put it into another company; besides, the proof abundantly sustains the auditor, when he finds in substance that after his father's death the executor named, admitted the receipt of $12,500, by way of advancement by his father, charged to him upon his books, and that he was willing to return $2,500 thereof, in order to equalize his advance with the advance made to his sister. It is true that the executor claims that if that offer was made, it was upon the expectation that he would be able to perfect the title to certain property at Chicago, which he had verbally purchased of his father, at about half of its real value ; but upon this question he is substantially contradicted by several witnesses, and the auditor having the witnesses before him, hearing their testimony and observing their manner, is the best judge of their credibility ; and his finding in that respect ought not to be disturbed on a motion to confirm the report.

There are several exceptions taken to the ruling of the auditor, none of which need special consideration, except the one above stated, involving the competency of the executor to testify, in respect to an alleged interview between the testator and one Mead, in the presence and hearing of the witness, James Marsh, Jr., in Mr. Mead's office at Chicago.

It is quite probable that the auditor in his exclusion of this question, may have regarded it excluded by the 399th section of the Code, which provides that no party to an action, or proceeding, nor any person interested in the event thereof, shall be examined as a witness in regard to any personal transaction, or communication between such witness and a person at the time of such examination, deceased.

There are abundant authorities justifying the exclusion of any personal communication or transaction, between the witness Marsh and the deceased. In *Ross* v. *Ross* (6 *Hun*, 182), it was held that in an action by a physician, to recover for services to the testator, the plaintiff could not testify whether he treated the testator professionally, or not, on the ground that such testimony would tend to prove a promise on the part of the testator to pay for such services, and the law would thereby imply the obligation to pay.

In *Howell* v. *Van Sicklen* (*Id.*, 115), it was held that in an action on a note made by the testator, where payment was pleaded, the plaintiff could not give evidence of its non-payment.

In *Le Clare* v. *Stewart* (8 *Id.*, 127), it was held, that the next of kin interested in the event of an action, though not a party, could not testify to a conversation with defendant's intestate whether favorable to, or against his interest.

In *Dyer* v. *Dyer* (48 *Barb.*, 190), it is held that in proceedings for the sale of real estate by the administrator to pay debts,—the claim of the respondent being disputed by the administrator, and tried by the Surrogate, after the witness had testified as to a conversation between the intestate and claimant, establishing the transaction,—the claimant could not be examined to prove that no such conversation had occurred, and

that no such transaction had taken place. In that case Justice MILLER said that proof that no such transaction occurred, was not an examination in respect to such transaction, and that it was not a satisfactory answer to the objection urged to the testimony.

Again on page 193, he says: "It would be, I think, an evasion of the spirit and scope of this provision of the Code, to hold that proof contradicting the evidence introduced had no relation to the transaction, which had been established by the witnesses introduced by the administrator, because it proved that no such trasaction had ever taken place."

Numerous other authorities might be cited, establishing the same principle; but such testimony should not be excluded, unless brought substantially within the provisions of the section; and the question in this case, in my opinion, did not come within its provisions, and did not call either for the personal transaction, or communication between witness and the testator, but for an interview between the testator and a third party heard by witness.

In *Simmons* v. *Sisson* (26 *N. Y.*, 264), it was held that the section in question did not prohibit a party sued by the administrator, from testifying to a conversation heard by him, between the deceased and a third person;—that such hearing was not such a transaction between deceased, and the witness.

In *Lobdell* v. *Lobdell* (36 *N. Y.*, 327), Justice PARKER says : " The transactions or communications respecting which the witness sought to testify, were not between himself and the deceased person, or, in the explict language of the statute, had personally by said party with the deceased person, but between the deceased and a third person. I am not able to see why he was not a competent witness to that transaction, or how with-

MARSH *v.* GILBERT.

out extending the limitation further than the statute has done, he should be excluded."

I entertain no doubt, therefore, that so far as section 399 of the Code was concerned, the question propounded and excluded was competent.

But I am equally clear that the question was properly excluded as immaterial. The question at issue was, whether the witness was chargeable with the sum of $12,500, charged to him as an advance upon the books of the deceased, which he alleged was for stock that proved worthless, and that for that reason, he should not be charged with the amount. He also claimed that his expectation was, that he should be able to perfect his title to the Chicago property under a verbal agreement with his father, which induced him to offer to pay back $2,500, so as to reduce the advance to the amount charged to his sisters; but the question propounded makes no allusion to the worthless stock, or the charge by way of advancement, but asks as to a conversation between Mead and the testator, relating to the subject of the transfer of the Chicago property to the witness, by way of advancement, and if the question had been answered, I am not able to perceive how it could have affected the question of the witness' liability for the advance charged in the books, and under the authorities above cited, it was immaterial whether the witness' father knew the witness was present, or not.

I am of the opinion that the question was properly excluded, and the counsel for the executor failed to show its materiality to the auditor.

The report should be confirmed.

Order accordingly.